## <u>PRELIMINARY STATEMENT</u>

This application is made on behalf of the bankruptcy trustee of NDK General

Contractors, Inc., ("NDK") to the District Court, to appoint a receiver, *pendente lite,* to

control the assets of the successor corporations of NDK: specifically, KJK Real Estate

Investors LLC, Asian Kat for Less, Diversified Quality Contractors and KJK Concrete

Specialists, LLC and S&K Concrete Specialists, LLC.  Second, the trustee requests that

the District Court order David and Kathleen Kemenash to provide an accounting of all of

the funds, aside from salary, taken from NDK General Contractors between 1995 and

2006, including an accounting of how the final $45,000 payment to NDK by the United

States Government Fort Dix payment was disbursed.  Finally, the trustee requests that a

constructive trust be imposed upon the proceeds of the sale of 1570 Whispering Woods

Way to prevent further dissipation of NDK assets. On September 30, 2009, Kathleen J.

Kemenash sold the property at 1570 Whispering Woods Way for $550,000.00.  The

affidavit of title falsely certified that David and Kathleen had:

> **"…not allowed any interests (legal rights) to be created which
> affects our ownership or use of this property.  No other persons
> have legal rights in this property…<u>There are no pending
> lawsuits</u> or judgments against us or other legal obligations
> which may be enforced against this property. <u>No bankruptcy
> or insolvency proceedings have been started by or against
> us…</u>"** (Emphasis added) (Exhibit F)

The transfer was a blatant attempt to liquidate assets belonging to NDK.

At this point, we are compelled to address defense counsel's repeated attempts to

discredit the James Stavros report (Exhibit E).  It has been many months since the report

came out, yet at no time did defense counsel attempt to depose this expert witness.

Neither did counsel produce a rebuttal report at any time.  Therefore, it is inappropriate at

this juncture to denigrate the report or its author.  These actions on the part of counsel are

merely an attempt to "blow smoke" around the facts surrounding their clients' activities.

## FACTUAL BACKGROUND

NDK started operations in December, 1995 as a Kemenash family-run construction business. (Nicole Kemenash transcript pages 18-19) NDK is an acronym for **N**icole Kemenash, **D**avina Levari and **K**athleen Crescenzi[1],  three of the four daughters of David and Kathleen Kemenash.  The fourth daughter, Lisa Barcia, was the bookkeeper for NDK. Three of the four daughters were officers of the company: Nicole was president, Kathleen Crescenzi was vice-president and Davina was secretary.  Lisa was not an officer in the company but signed almost all of the company checks. Kathleen Kemenash (mother), one of the highest paid employees in the company, allegedly was no more than a "gopher". (Exhibit E) In reality, David was running the company, with his daughters as a façade.  He held no assets in his name during this time. Everything was held in the name of his wife, Kathleen because David had multiple judgments against him (Exhibit A).

At some point early on in the history of the company, NDK was sued as successor to DKA, a David Kemenash company which went bankrupt in the 1990's. In January 1992, David Kemenash was convicted on 10 counts of bank fraud, attempted bribery and other charges for which he was imprisoned for approximately 39 months, thus the reason for not having an ownership interest in NDK and the reason for his wife holding all of the assets in her name. Our investigation indicates that while David was in prison, his close friend John Lilliston would purchase 1512 East Wheat Road in Vineland, NJ for NDK operations. Lilliston later transferred the property to Kathleen J. Kemenash in 2003 but in the intervening years, NDK paid rental income to him.  Lilliston used this income to pay

---

[1] Since both mother and daughter are named Kathleen, full names will be used when referring to Kathleen Kemenash (mother) and Kathleen Crescenzi (daughter). At last inquiry, however, a Crescenzi divorce was pending and Kathleen Crescenzi may have returned to her maiden name. One of the former Vice Presidents of NDK was the son-in-law Joseph Crescenzi. (Joseph Crescenzi, page 4)

down the mortgage and reduce the balance that the Kemenash family owed him.[2]

Joseph Crescenzi, former vice-president of NDK and the husband of the vice-president, Kathleen, testified under oath that money was dug up from David's yard as "seed money" to start up the company.[3] This assertion of buried money by Crescenzi gains added credence when reviewing an excerpt from an FBI transcript contained in a Federal Court Order of the following statement by David Kemenash:

> **I can come out here with a suitcase in, in ten minutes, right now, with over a half million bucks. That I have, I don't have this in my bank and I'm not puttin' that in my bank 'cause I can't pull it out.**
> (Exhibit  K)

When NDK was sued as successor to DKA, David formulated a plan to drain assets from the company and place them in various forms with various friends and family members. Joseph Crescenzi stated under oath:

> **Dave was scared. They had, I guess, a lawsuit pending [alleging] that DKA was the reason why NDK evolved and his method behind that was that he wanted to drain NDK of everything just in case that they did prove that DKA was the reason why there wouldn't be anything left for them to take.**
> (Joseph Crescenzi deposition dated July 17, 2008, page14-15)

This was accomplished by means of a conspiracy which included his wife Kathleen, his daughter Lisa Barcia, who signed most of the company checks, and Robert Kahan, who permitted NDK money to be moved into Tara Developers, LLC and from Spring Street Housing LLC and Titus Housing LLC into Kathleen J. Kemenash's personal account.

---

[2] Although Lilliston's name was on the title, it was really owned by the Kemenash family who benefited from the increase in equity between its acquisition by Lilliston in 1996 and his sale to Kathleen Kemenash in 2003. Lilliston conceded that Nicole's testimony was questionable when she said  that she did not know who owned this property before her mother and that NDK only had a relationship with Lilliston with regard to company vehicles. (Lilliston, pages 79-80.) Nicole's testimony was simply untrue.

[3] Although Davina denies it, Joe Cresenzi testified that she walked in on David as he was using a blow dryer to dry off the damp moldy money.

Subsequently, NDK became very lucrative, landing a multimillion dollar government contract at Fort Dix in September, 2003.  David was clearly running NDK, not the daughters who were the ostensible owners. Kathleen Crescenzi, Vice President testified, "I wasn't in there a whole lot" and that her job involved typing and "running around." (Kathleen Crescenzi transcript page 31) Davina Levari became an officer of what was to become a multi-million dollar corporation when she was "18, 19, maybe." (Davina Levari transcript, page 10) Her job duties were "…answering phones, filing, typing. Doing running around, errands. That kind of stuff. Faxing, you know." (Davina Levari transcript, page 9) Joseph Crescenzi, Scott Kahan, NDK employee, John Lilliston (Lilliston transcript, page 114) and Mark Shavell, NDK accountant also testified that David was running the business. (Exhibit E)

Although Kathleen J. Kemenash is the ostensible owner of all of the successor companies to NDK, her husband testified about her capabilities as follows:  "…I hate to say this, [Kathleen] don't have the brains to run a business". David thus essentially conceded that he was the moving force or alter ego behind all of the successor businesses as well.(David Kemenash transcript, page 85)

After many years of lucrative operations, NDK imploded when two jobs allegedly went went bad at the same time: Embreeville and Fort Dix. (Nicole Kemenash transcript, pages 43-44).  NDK never finished the Fort Dix job and ultimately settled with the government in November 2006, however $45,000 of that settlement has not been accounted for.  Joe Crescenzi, however, described the demise of NDK as a scam:

> **[David] said you would assign [contractors and subcontractors] to do the work, you will get them to do their first—probably he said—you probably would get away with two months before they really start crying about their money because you are supposed to pay on 30-day increments.  He said he would get them to do**

> **about two months worth of work and then never pay
> them and that he would get their draw—on the
> payment requisition he would get—the main contractor
> gets the draw out of what's completed but you never
> pay the subs.**
> (Joseph Crescenzi statement, pages 9-10)

The "official" end date of NDK was August, 2006.  That is when the operating

accounts end.  Lisa Barcia testified that it ceased operations in August, 2006. (Lisa Barcia

transcript, page 20-21). David testified that no one worked beyond August, 2006. (David

Kemenash transcript page 76) Davina testified that "…everybody was pretty much done

in August of 2006." (Davina Levari transcript, page 71)

However, operations continued beyond August, 2006.   Scott Kahan, an employee

testified that operations ceased after August because "it was starting to get cold out."

(Scott Kahan transcript, page 62). The NDK settlement agreement between the

government and NDK is signed by Nicole and Lisa on November 1, 2006. (Exhibit G) As

is typical in this case, the last $45,000 from this contract disappeared.[4]

---

[4] According to NDK's attorney near the end of its operations, $45,000 went to Tara Developers in 2006.
Robert Kahan, owner of that company, testified that he knew nothing about it and never received a penny
of the money.

### I.     Building of 1570 Whispering Woods Way with NDK funds

The Stavros report attached hereto details that over $500,000.00 of NDK funds and labor were used to build David and Kathleen's home in the early 2000's, yet Nicole testified that she did not know where her father got the funds to build the house. (Nicole Kemenash transcript, page 34)

In an effort to legitimize this scam, a mortgage was drawn up in favor of NDK in the amount of $200,000.00.  It is the trustee's belief that the entire $200,000.00 was paid back with NDK funds; however, there is evidence that a 1999 Rolls Royce, an asset of NDK was transferred to Kathleen J. Kemenash for no consideration, and then sold by family friend, John Lilliston on ebay for approximately $91,000.00.  This money was deposited into Kathleen Kemenash's personal account and the very next day, it was used to pay off $85,000 of the $200,000 "loan" to NDK.[5] (Exhibit E)

### II.     $100,000 each for the daughters' new homes

Joe Crescenzi testified that as part of the scheme to drain NDK, the daughters each received money for the building of their new homes in the same general area as the parents' home. (Joseph Crescenzi transcript, page 15) Vice President, Kathleen Crescenzi later confirmed that that an amount of money was paid by NDK on her behalf for her home, which was never repaid. (Kathleen Crescenzi transcript, p.18). When asked further why NDK would be purchasing jewelry or furs, she testified, "why not? I mean the business could buy whatever we wanted, so why not? I don't see the problem."(Kathleen Crescenzi transcript, page 28)

---

[5]   This home was recently sold without the trustee's knowledge and now funds of the NDK bankruptcy estate are irretrievably lost. In the course of that transaction, Kathleen and David Kemenash, falsely certified in the Affidavit of Title that "There are no pending lawsuits or judgments against us or other legal obligations which may be enforced against this property. No bankruptcy proceedings have been started by or against us."  (Exhibit F)

### III.     Successor Companies to NDK

KJK Real Estate Investors LLC, incorporated on January 5, 2005 by Robert

Casella, Esquire of Basile & Testa, is one of the Kathleen J. Kemenash-owned companies

which was funded by NDK.

The trustee's investigation indicates that assets owned by KJK Real Estate

Investors LLC include the following: (1) the property 2000 North Delsea Drive which

was paid for using refinance money from the Whispering Way property built with NDK

funds, (2) direct NDK wire transfers at the end of NDK's operation, (3) NDK equipment

purchased at auction only days after creditor Sovereign had judgment entered against

NDK, (4) NDK vehicles for which a transfer of equity agreement was drawn up and (5)

receivables from NDK's client Robert Kahan. (Exhibits E, N,P)

One of the last NDK bank statements, dated August 31, 2006, shows a $40,000

transfer from NDK into KJK Real Estate Investors. (Exhibit N) That $40,000 was in part

used to pay the insurance premium for successor company S&K Concrete Specialists

(Exhibit O)

Quickbook documents from KJK Real Estate Investors, LLC for the calendar year

2006 show entries for two of Robert Kahan's jobs, Spring Street ($8491.53) and Titus

Housing ($83,000). (Stavros Exhibit 13 to Plaintiff's Exhibit E)  Robert Kahan testified

that KJK Real Estate Investors never did any work on Spring Street or Titus. (Robert

Kahan transcript, page 96) They were NDK jobs. (Lisa Barcia, transcript page 56)

At the end of NDK's existence, a transfer of equity agreement was drawn up for a

2005 Ford F-150, transferring equity from NDK to KJK Real Estate Investors.  As an

auto dealer familiar with the Kemenash family, John Lilliston stated that from the looks

of the document it was a transaction solely between NDK and KJK. (John Lilliston

transcript, pages 88-89)

In March, 2007 David Kemenash for KJK Real Estate investors purchased NDK's equipment for $187,849.20 at auction in what Basile & Testa argued, early on in the litigation, was an "arms length transaction." (Exhibit B)

KJK Real Estate Investors continued to work out of the same address as NDK and used the same phone number as NDK.(Joseph Crescenzi transcript, 6/12/07, pages 6-7)

Several other companies were formed by Basile & Testa, during NDK's operation, after its demise and during pending litigation. Specifically, Basile & Testa formed:

- Crescenzi & Son Concrete Contractors, Inc. on or about August 3, 2001.

- N. Kemenash Sales & Show Stables, LLC on or about August 20, 2003

- KJK Real Estate Investors LLC on or about January 5, 2005

- Diversified Quality Contractors LLC on or about June 26, 2008

- Asian Kat for Less LLC on or about January 24, 2008

- (Exhibit  H)

Nathan Van Embden, who handled the bankruptcies of three of the four Kemenash daughters, formed KJK Concrete Specialists, LLC on or about February 23, 2007, while he was simultaneously negotiating a settlement with counsel for Sovereign Bank. (Exhibit R)

Todd Heck, Esq. of Basile & Testa signed responses to requests for admissions regarding the entity, S&K Concrete Specialists, stating, " …none of the present defendants nor their family members were owners or operators of S&K Concrete Specialists, which is believed to have been owned by Robert Kahan." (Exhibit C, page 6, paragraph 17) In fact, Kathleen J. Kemenash began that company with Scott Kahan and

she was in fact Vice President. (Scott Kahan transcript, page 42 and Exhibit I)

In response to a subpoena served on Basile & Testa requesting "any and all shareholder minutes, shareholder agreements and asset purchase agreements over the last seven (7) years", virtually nothing was produced (Exhibit Q). This speaks volumes that the successor companies failed to observe even the most basic of corporate formalities and were shell entities.

### IV.    The Rolls Royces

David Kemenash testified that when Nicole bought a second Rolls Royce with NDK funds, he advised her to sell it.  Nicole argued, "Dad, you said I could reward myself." (David Kemenash transcript, page 46) Nicole listened to her father.  Over the years, NDK paid her mortgage and property taxes, paid for the upkeep on her horses, paid money down on her home, paid money for luxury cars, family vacations to Aruba and the Jersey shore, bonuses and on and on.

None of this was reported as income on her income tax returns. Moreover, it didn't stop after NDK started losing contracts. For example, a mere few weeks before NDK allegedly stopped operating, NDK check 8847, in the amount of $5300, was made out for the annual Sea Isle City rental property.

The NDK accountant, Mark Shavell claimed to be ignorant of what was going on in the company. As a result, he failed to prepare 1099's for any of the officers for the value of the personal use of the luxury vehicles and other benefits given by (bled from) the company, even as it was going under.(Mark Shavell transcript, page 43 and Exhibit E)

When NDK's bookkeeper, Lisa Barcia, was asked about the Rolls Royces, she testified that she had no knowledge of the transfer of one of them to her mother, or John

Lilliston being involved in the sale.  She simply remembered the cars "coming and going". (Lisa Barcia transcript page166).

### V.        The Unquantified Cash Drain

The Stavros report quantifies what provably David and Kathleen Kemenash took from NDK. Although the report mentions the cash drain from NDK, the money has not been traced or quantified.  The trustee's investigation indicates, however, that much of this cash also made its way into the Kemenash hands, successor companies, or into accounts controlled by the Kemenash's such as the elderly Aunt, Mary St. Clair, who with a social security income of approximately $606 per month, somehow had thousands in cash deposited regularly into an account co-owned with Kathleen J. Kemenash. The account detail for Mary's account reveals that $67,950 in cash deposited into this account from 7/18/02 to 6/18/05. (Exhibit J)

| Statement Date | Date of Deposit | Cash Deposited |
|---|---|---|
| July 18, 2002 | July 11, 2002 | $4,000.00 |
| October 18, 2002 | October 11, 2002 | $7,000.00 |
| October 18, 2002 | October 15, 2002 | $8,000.00 |
| November 18, 2002 | October 21, 2002 | $5,000.00 |
| November 18, 2002 | October 23, 2002 | $5,000.00 |
| January 18, 2003 | January 7, 2007 | $2,700.00 |
| February 18, 2004 | February 9, 2004 | $5,000.00 |

| October 18, 2003 | September 26, 2003 | $6,000.00 |
|---|---|---|
| October 18, 2003 | September 30, 2003 | $4,500.00 |
| April 18, 2005 | April 11, 2005 | $6,000.00 |
| April 18, 2005 | April 18, 2005 | $5,000.00 |
| June 18, 2005 | May 20, 2005 | $7,500.00 |
| June 18, 2005 | May 23, 2005 | $2,250.00 |

(Exhibit J)

Lisa testified that the checks made out for thousands of dollars in cash on a regular basis _always_ went to Nicole Kemenash. (Lisa Barcia transcript pages158-159)

At certain points, some of the cash deposited into the Kathleen Kemenash/Mary St. Clair account made its way back to NDK as a "loan" from Mary St Clair, and naturally had to be repaid, this time by NDK check. (NDK check 9239 to Mary St. Clair dated June 10, 2005 in the amount of $20,000, memo "repayment of loan" attached as part of Exhibit J).[6]  In essence, NDK borrowed its own money from Mary and then repaid her by check, thus legitimizing the money in Mary's account.

**VI.   Lisa Barcia**

David and Kathleen's oldest daughter, Lisa, was a secretary and bookkeeper for NDK. (Lisa Barcia transcript, page 18). All of the NDK checks were written by either Lisa or Nicole (Lisa Barcia, page 30), In addition, Lisa prepared W-2's (Mark Shavell,

---

[6] Mary St. Clair never responded to a subpoena concerning these transactions, therefore Plaintiff should be entitled to negative inferences regarding same.

13

page 44) and made entries into Quickbooks (Lisa Barcia, page 34).

As someone who was responsible for writing most of the checks and maintaining the books for many years at NDK, Lisa Barcia remembered remarkably little about where the money went. When asked about the NDK credit cards, she testified that they were not used for personal use. "They were used for NDK."(Lisa Barcia transcript, page184) This was untrue. (Exhibit E) When asked about NDK outlays for 2241 Brookfield St., a property owned by Nicole and later sold to her sister Davina, Lisa testified that she did not know who owned the property and succinctly stated, "<u>You can ask Nicole. I don't recall anything</u>." (Lisa Barcia, page 73). Even when provided checks that she signed month after month to Nicole's mortgage company, she simply stated that she did not remember. (Lisa Barcia, page 74-75) When asked about the NDK outlay in the amount of $101,000 for Nicole's home, she did not recall it, nor whether it was paid back. (Lisa Barcia, page 69) She even forgot the details of a loan to herself from NDK in the amount of $10,000.00(Lisa Barcia, page 49-50).

When confronted with NDK checks paying the property taxes on David and Kathleen's home, Nicole's property at 2241 Brookfield, and the rental property owned by her mother and used by NDK for their operations, she only recalled paying them on behalf of her mother/landlord's property. (Lisa Barcia, pages 171-172).

**VII.   Robert Kahan**

Robert Kahan is a developer working out of the Trenton, NJ area. Lisa Barcia claimed that early on in the history of NDK, Kahan worked for NDK as a consultant. (Lisa Barcia transcript, page 204). Over the years, the relationship changed and then NDK began working for Robert Kahan on his developments. (Lisa Barcia, page 204). Nicole testified that NDK was a general contractor on Spring Street and Titus, two Kahan

14

jobs. (Nicole Kemenash transcript pages 41-42).  She also testified that "…while we were still in business, we were working for Bob, basically." (Nicole Kemenash transcript, page 41).  Robert Kahan eventually began working out of the NDK location at 1512 East Wheat Road in 2003 or 2004. (Lisa Barcia, page 204)

The trustee's investigation indicates that some of Kahan's companies are successors to NDK.  For example, Tara Developers, a Kahan entity, apparently received a $45,000 wire transfer from the final Fort Dix payment, yet when asked if Tara Developers completed the Fort Dix job, his answer was "Absolutely not." (Robert Kahan transcript page 128) His attorney's remarks after that answer made it onto the record. Nathan Edelstein stated "No comment."

Between 2004 and 2006, records indicate that over $100,000.00 went from NDK to Robert Kahan or his companies. This is unusual because NDK was working for Kahan and the money should have been going the other way. Even Lisa Barcia, who handled the books, could not explain why money should have been going from Kahan to NDK at this point. (Lisa Barcia transcript, page154)

Kahan testified that the money he received from NDK was repayments of "advance[s] against the construction".  (Robert Kahan transcript, page 83) They were an advance for work that was never done.(Robert Kahan, page 83) Kahan refused to explain who at NDK asked him for the advances.  He further refused to answer questions concerning subsequent payments to Kathleen J. Kemenash from his personal account and business accounts, citing attorney client privilege and confidentiality. (Robert Kahan, pages 133-135)  Kahan's Spring Street and Titus jobs appear on the financial sheets for KJK Real Estate Investors, despite Kahan's testimony that KJK did no work on those jobs.

**VIII.   Tracing the Funds from NDK to Asian Kat**

Kathleen J. Kemenash <u>was</u> the owner of 1570 Whispering Woods Way, defendant KJK Real Estate Investors LLC and defendant Asian Kat for Less LLC. The Whispering Woods Way property was built using NDK funds, which funds were not fully repaid by Mrs. Kemenash. (Exhibit E) KJK Real Estate Investors was captalized using NDK funds and equipment. (See analysis above)

On or about March 15, 2005, Kathleen J. Kemenash mortgaged 1570 Whispering Woods Way for $350,000. (Certification of Mrs. Kemenash attached to Exhibit D)

On or about March 31, 2005, KJK Real Estate Investors bought 2000 North Delsea Drive for $295,000, using funds directly from 1570 Whispering Woods Way. (Certification of Mrs. Kemenash, attached to Exhibit D)

On or about March 30, 2007, KJK Real Estate Investors sold 2000 North Delsea Drive for $360,000. (Closing documents attached as Exhibit to Exhibit D)  On or about April 2, 2007, $333,318.73 from the sale of 2000 North Delsea Drive was deposited into the KJK Real Estate Investors bank account.[7] (April, 2007 Bank statement for KJK Real Estate Investors attached as Exhibit to Exhibit D)

On or about February 7, 2008, Kathleen J. Kemenash wrote check 1035 for $127,000 to Sany for Asian Kat for Less.  Mrs. Kemenash certified that the source of these funds was the KJK Real Estate Investors account. (Certification of Mrs. Kemenash, paragraphs 11-12, attached to Exhibit D)

---

[7] Although Mrs. Kemenash in her certification states that the money came from the refinance of 1512 East Wheat Road, she later conceded that the money came from the sale of 2000 Delsea Drive as set forth accurately in this factual background.

**LEGAL ARGUMENT**

I.   **THE DISTRICT COURT HAS THE AUTHORITY TO APPOINT A FEDERAL RECEIVER TO THE SUCCESSOR CORPORATIONS TO NDK AND TO ORDER AN ACCOUNTING**

The federal district court derives its power from the Constitution and from Congress. Bluebeard's Castle v. Government, Virgin Islands, 321 F.3d. 394, 400(3d Cir. 2003). The Federal Rules apply in this instance when a trustee brings a plenary action against third parties, such as David and Kathleen Kemenash in Federal District Court. Ferguson v. Bucks County Farms, Inc. 280 F. 2d 739, 746 (3rd Cir. 1960), citing, Moore on the Federal Rules of Civil Procedure. In fact, the federal rules acknowledge the power of the district courts to appoint receivers.

F.R.Cv.P. 66.

Federal case law is well settled that the district court has the power to appoint a receiver under appropriate circumstances. Tanzer v. Huffines, 408 F.2d 42 (3rd Cir. 1969) *citing*, Burnrite Coal Briquette Co. v. Riggs, 274 U.S. 208, 212, 47 S.Ct. 578, 71 L.Ed. 1002 (1927). Those circumstances often include fraud and mismanagement by the officers of the company. Tanzer, supra, *citing*, Savage v. United States District Court, etc., 144 F.2d 575 (9th Cir. 1944); Coskery v. Roberts & Mander Corporation, 97 F.Supp. 14 (E.D.Pa.), appeal dismissed, 189 F.2d 234 (3rd Cir. 1951). Similarly, a federal receiver may be appointed, where, as in the case at bar, corporate assets are being dissipated. Orth v. Transit Inv. Corporation, 132 F.2d 938, 945 (3d. Cir. 1942). Furthermore, a receiver is appropriate where, as here, an accounting of all of the successor companies is necessary and where it is necessary to preserve books and records against possible destruction. Id.  The receiver can be appointed pre-judgment or *pendente lite*. Tanzer, supra at 43.

17

The receiver so appointed is an officer of the court and "…subject to its orders in relation to the property for which he is responsible until discharged by the court." Holland v. Sterling Enterprises, Inc. 777 F.2d. 1288, 1291 (7th Cir. 1985), *citing*, Federal Savings & Loan Insurance Corp. v. PSL Realty Co., 630 F.2d 515, 521 (7th Cir. 1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109 (1981) The receiver is "…an indifferent person between parties, appointed by the court to receive the rents, issues, or profits of land…He is appointed on behalf of all parties, and not of the complainant or the defendant only…It is the court itself which has the care of the property in dispute." Id., *citing*, Booth v. Clark, 58 U.S. 322, 330 (1854)

It is undisputed that the district court has the authority to appoint a receiver pursuant to its general equity powers.  It is clear, as will be set forth more fully below, that this power should be exercised, where as here, the actions of the parties amount to "gross and deliberate fraud". Tanzer, supra, at 43.

When NDK filed for bankruptcy, all causes of action held by NDK passed to the bankrupt estate and are enforceable by the trustee. John L. Motley Associates, Inc. v. Rumbaugh, 104 B.R. 683, 687-688 (E.D. Pa 1989), *citing*, Pepper v. Litton, 308 U.S. 295, 306-307, 60 S. Ct. 238, 245, 84 L. Ed. 281 (1939). Therefore, the trustee has standing to make this application for a receiver *pendente lite* for the Kemenash companies. The Kemenash's assets and their corporations' assets are intermingled; therefore, the trustee is requesting an accounting of David and Kathleen's personal assets as well.[8] Furthermore, David and Kathleen Kemenash's actions in depleting NDK of its assets in order to start up new companies and leave NDK unable to repay its creditors

---

[8] The fact that David and Kathleen are continuing to liquidate, liquidate, liquidate, lends an urgency to this application. The assets from the sale of their home are already being dissipated.  We believe that $30,000 of the Whispering Woods Way proceeds went to Lisa Barcia so that she could clear an IRS lien on herself.

coupled with the recent fraudulent affidavit of title constitute the necessary "gross and deliberate" fraud in order to justify appointment of the receiver (Exhibit E).

The Stavros report, which was based on voluminous subpoenaed documents and the testimony of the former Vice President, Joseph Crescenzi prove that David and Kathleen Kemenash conspired to drain NDK of its assets.  As this has been addressed at length in the background section, the focus of this section will be on the recent fraudulent activities of David Kemenash and Kathleen Kemenash in selling their home which was built with NDK funds.

Specifically, David and Kathleen J. Kemenash, certified under oath that they had:

> **"…not allowed any interests (legal rights) to be created which affects our ownership or use of this property.  No other persons have legal rights in this property…There are no pending lawsuits or judgments against us or other legal obligations which may be enforced against this property. No bankruptcy or insolvency proceedings have been started by or against us…"** (Emphasis added) (Exhibit F)

As a result of this fraud, the Kemenash's were able to sell their home with net proceeds of $212,518.54. (Exhibit L). Moreover, their daughter, Lisa Barcia, benefited by the sale by placing a false mortgage on the property just prior to settlement, to the tune of $30,000[9]. (Exhibit L).  The trustee's investigation indicates that the Lori Lamb mortgage was also a sham as the recorded mortgages for both Lori Lamb and Lisa Barcia were sent to Lisa Barcia's post office box (Exhibit M).[10]

---

[9]   Despite the fact that the information was subpoenaed, no documents evidencing a money transfer in support of the loan agreements and mortgages were provided by either of the two mortgagees.

[10] In a typical attempt to cover up the sham mortgages in this case, both recorded mortgages were to be sent to a Box 360, which the post office said does not exist. The post office pointed out that Lisa Barcia's post office box number is 366, close enough that, as the exhibit itself shows, the documents would end up in the correct box. (Exhibit M)

Therefore, as a recent manifestation of a pervasive and ongoing fraud, it is the trustee's position that this act alone, i.e., falsifying an affidavit of title in order to transfer a substantial asset of NDK, is sufficient to constitute "gross and deliberate fraud" such as to warrant the appointment of a receiver to the defendants' companies.  In addition, the trustee is requesting that a constructive trust be imposed on the proceeds from the sale of the home to prevent further dissipation of assets belonging to NDK.

II.   **A CONSTRUCTIVE TRUST SHOULD BE IMPOSED ON THE PROCEEDS FROM THE SALE OF THE WHISPERING WOODS WAY PROPERTY**

A constructive trust should be imposed on the proceeds from the sale of the Whispering Woods Way property because the money used to build the home was embezzled by NDK employees David and Kathleen Kemenash. (Exhibit E)

"Any employee, agent…who embezzles or, with intent to defraud, takes money or receives, retains or appropriates to his own use or the use of another, any property or the proceeds of the sale of the same, belonging to his employer…is guilty of a misdemeanor." Trustees of the Clients' Security Fund of the Bar of New Jersey v. Yucht, 243 N.J. Super. 97, 109 (Law Div. 1989) *citing*, N.J.S.A. 2A:102-5.

It is well settled that "… no title is acquired by an embezzler, but that such title remains in the victim, who is the beneficial owner of a constructive trust which is imposed on such monies or on property purchased with such money." Trustees of the Clients' Security Fund of the Bar of New Jersey v. Yucht, 243 N.J. Super. 97, 111 (Law Div. 1989) *citing*, 38 A.L.R.3d 1354; Dennis v. United States, 372 F.Supp. 563 (E.D. Va. 1974) (E.D.Va.1974)

Before a Court can impose a constructive trust, two requirements must be met: (1) the Court must determine that a Party has committed a wrongful act and (2) that the

wrongful act resulted in a transfer of property that unjustly enriched the person receiving the property. <u>Flanigan v. Munson</u>, 175 N.J. 597, 608 (2003) *citing*, <u>D'Ippolito v. Castoro</u>, 51 N.J. 584, 589 (1968)**.**

A constructive trust should be imposed "…only when the equities of the case clearly warrant it." <u>Id.</u> at 611. Stated another way, imposition of a Constructive Trust must be based on "clear, definite, unequivocal and satisfactory evidence." <u>Gray v. Bradley</u>, 1 NJ 102, 104 (1948). (See also, <u>Dessel v. Dessel, 122 N.J.Super. 119, 121 (App.Div.1972)</u>, *aff'd, <u>62 N.J. 141 (1973)</u>*imposing a constructive trust based upon unjust enrichment after clear and convincing evidence that the property was legally acquired but not used for the purposes intended by the beneficiary.) This burden must be maintained by the Party arguing for the constructive trust. <u>Id</u>.

The New Jersey Supreme Court has defined "clear and convincing" to mean that the evidence is "so clear, direct and weighty and convincing as to enable either to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." <u>In re Seaman</u>, 133 N.J. 67, 74, (1993).

The New Jersey Supreme Court has also been instructive on how a motion judge should utilize the clear and convincing standard in the context of deciding a motion for summary judgment.

> Similarly, where the First Amendment mandates a "clear and convincing" standard, the trial judge in disposing of a directed verdict motion [or a summary judgment motion] should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity.

<u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 533 1995).

In the case at bar, there can be no dispute that the falsified affidavit of title recently signed by David and Kathleen Kemenash to facilitate the sale of their home is a

wrongful act (Exhibit F). Moreover, there is clear and convincing evidence that the money used to build the home was embezzled from NDK (Exhibit E). Interestingly, their counsel, in their recent filing dated December 28, 2009, failed to address the issue of the false affidavit of title. Further, David and Kathleen Kemenash were unjustly enriched when funds were transferred from NDK to them in the provable amount of $1,022,605. This figure includes the amounts for the building of the Whispering Woods Way, which are set forth at length in the Stavros report (Exhibit E).

Therefore, since the two elements for the imposition of a constructive trust have been established by clear and convincing evidence, the trustee respectfully requests that a constructive trust be imposed on the proceeds from the sale of the Whispering Woods Way property, in the amount of $212,528.54.

## CONCLUSION

The trustee respectfully requests the following relief: (1) That a receiver be appointed to control the assets of all of the companies owned by David and/or Kathleen J. Kemenash; (2) That David and Kathleen Kemenash be ordered to provide an accounting to the trustee of the funds taken from NDK; and (3) That a constructive trust be imposed on the proceeds from the sale of the Kemenash home, 1570 Whispering Woods Way, in the amount of $212,528.54.

Respectfully submitted,
SALDUTTI, LLC

/S/ ROBERT L. SALDUTTI
_____
ROBERT L. SALDUTTI, ESQUIRE
MICHAEL VENEZIANI, ESQUIRE
Attorneys for Andrew Sklar, Trustee

Dated:  January 7, 2010

## PROOF OF SERVICE

The original of the within Motion to Appoint Receiver has been filed with the Clerk of the United States District Court for the District of New Jersey, Mitchell H. Cohen Building & U.S. Courthouse, 4th & Cooper Streets, Camden, New Jersey via ECF electronic filing.

SALDUTTI, LLC

/S/ ROBERT L. SALDUTTI

_____
ROBERT L. SALDUTTI, ESQUIRE
MICHAEL VENEZIANI, ESQUIRE
Attorneys for Andrew Sklar, Trustee

**PROOF OF SERVICE:** On January 7, 2010, the undersigned, notified all parties via ECF electronic filing, the following:

**Table of Contents; Notice of Motion; Table of Authorities;
Brief; Proof of Service; and Proposed Order**

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

/S/ PATRICK J. WIRTH

_____
PATRICK J. WIRTH

Dated: January 7, 2010